MANUEL SOLER, PLAINTIFF-RESPONDENT, v. CASTMASTER,
DIVISION OF H.P.M. CORP., A/K/A H.P.M. DIVISION OF
CASTMASTER, INC., DEFENDANT-APPELLANT.

Argued October 24, 1983—Decided December 21, 1984.

George J. Kenny argued the cause for appellant (*Connell, Foley & Geiser*, attorneys).

*Allen B. Gillman* argued the cause for respondent.

The opinion of the Court was delivered by

HANDLER, J.

This appeal, as well as the companion case of *Brown v. United States Stove Co.*, 98 *N.J.* 155 (1984), decided today, presents as a major issue a manufacturer's responsibility under principles of strict products liability for injuries to a foreseeable user of a machine that was substantially altered after it left the manufacturer's control. We must address a series of questions in resolving the ultimate issue: whether the machine as originally designed was defective; whether the subsequent alteration was substantial; whether the alteration was foreseeable; and whether the original design defect was a proximate cause of the accident, taking into account the subsequent alteration. Because of the procedural course by which this case reaches us, we must also consider the standards for deciding when any of these issues presents a question for a jury's determination and when it is properly left for the court to decide.

Plaintiff, Manuel Soler, sued defendant Castmaster, Division of H.P.M. Corp., for the improper manufacture of a die-casting machine, the operation of which caused him severe injuries. The complaint alleged causes of action in strict liability, as well as negligence and intentional wrongdoing, for the accidental injuries. Although other parties were named originally as defendants, they are no longer in the case. The matter was tried before a jury. After most of plaintiff's evidence had been presented, the trial court, on defendant's motion, entered a judgment of involuntary dismissal against plaintiff pursuant to Rule 4:37. In entering that judgment, the trial court ruled that there was no dispute that the machine had been altered by the plaintiff's employer, and, as altered, was "an entirely different functional machine." Further, according to the court, there was "no evidence from which a jury could find that the machine

as designed and sold by the defendant had in it the elements which were the proximate cause of this accident."

The Appellate Division reversed and remanded the matter for trial. The court ruled that there were unresolved factual disputes relating to whether (1) the machine was defective when manufactured; (2) the employer's alterations created an entirely different functional machine; and (3) the design defect proximately caused the accident. The Appellate Division also ruled that the "proffered testimony constituted sufficient basis for at least a consideration of the inadequate warning, design defect question." This Court granted certification, 93 *N.J.* 272 (1983). For the reasons expressed in this opinion, we affirm the judgment of the Appellate Division.

## I

Plaintiff was injured when certain moving parts of a die-casting machine, manufactured by defendant, closed on his hand. The machine included a mold consisting of two parts, one of which was stationary. In the operation of the machine, during one cycle, the two parts of the mold closed together, forming a cavity into which molten metal was injected. During a second cycle, the metal cooled and the two parts of the mold would separate, freeing the cast metal from the mold. According to the original design of the manufacturer, each cycle of the machine was started manually by the operator. The first cycle began when the operator pressed a designated electrical push-button, causing the mold to close so that hot metal could be injected into it. The second cycle started when the operator pressed another button, permitting the metal to cool and the completed cast to drop from the mold or be removed by hand by the operator. Further, as designed and manufactured by defendant, there was no safety gate or any other device to guard against a person's hand or fingers from coming into contact with the machine's moving parts while it was either in motion or capable of being set in motion. The machine also lacked an

interlock to cut off power while a worker's hands were engaged in dislodging a jammed part from inside the machine.

Sometime after the machine left the manufacturer's control, plaintiff's employer altered the manual mode for starting each cycle. It added a trip wire that automatically started all cycles after the machine was initially turned on. As altered, the second cycle was completed when the cast product separated and fell from the mold, striking the trip wire, which would automatically activate the first cycle. Thus, as altered, the cycles operated continuously. At the time the trip wire was incorporated into the machine, the employer also added a safety gate. When this gate was opened, it would shut off all power into the machine, preventing the opening or closing of the mold.

Plaintiff testified that the injury occurred when he attempted to dislodge a finished product that had not fallen free from the mold. Apparently, this type of jamming of the machine was frequent. In attempting to dislodge the piece, plaintiff claimed that he opened the safety gate and reached into the machine. At this point, the machine was stopped. However, after plaintiff dislodged the part, the machine started again, catching his hand between the two parts of the mold. Although plaintiff testified that the safety gate was open when the machine began to move, his supervisor, who arrived moments after the accident, testified that plaintiff's arm was somehow under the closed safety gate. At trial, plaintiff did not offer an explanation as to how the machine recycled when he attempted to dislodge the part. However, in deposition he had testified that when the piece fell from the mold, it had hit the trip wire, reactivating the cycle.

It was undisputed that the automatic starting mechanism and safety gate were added to the machine by plaintiff's employer. However, plaintiff's expert testified that the machine was unsafe as designed because it had no safety gate or device to act as a barrier in preventing a person's hands from contacting the machine's moving parts. The expert further testified that the

machine should have been equipped with a safety interlock that would shut off all electrical power to the machine. In his opinion, the lack of this device was crucial, since it was foreseeable that a machine—either manual or automatic—could malfunction while a person's hand was inside the machine.

Even as originally designed, when a cycle was stopped in the manual mode and the operator was required to press a button to start the machine, the danger or risk that the machine would start up accidentally was still present. Plaintiff's expert analogized the situation to that of a light switch in the "off" position, subject to the existing danger that a large surge of electricity would override the switch and cause the machine to start. A safety gate with an interlock would have eliminated this risk. Those safety devices, according to the expert, were available at the time the machine was built. In addition, the expert testified that such devices would have entailed only moderate cost and would not have impaired the usefulness of the machine. He also stated that the safety device later furnished by the employer was inadequate, as evidenced by the accident itself.

The expert further testified that although the machine was altered in some respects, "the original machine was still there." Plaintiff argues that this statement corroborates testimony of plaintiff's supervisor that the machine's function remained unchanged by the alterations. In addition, the evidence relating to the design and alteration of the machine included testimony that the machine did not have any danger warnings on it at the time of the accident. There was, however, no testimony as to the presence or lack of any warnings pertaining to the dangers in operating the machine at the time the machine left the control of the manufacturer.

## II

Under strict products liability a manufacturer has a duty to make sure that its manufactured products placed into the stream of commerce are suitably safe when used for their

intended or reasonably foreseeable purposes. *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 169 (1979); *see Green v. Sterling Extruder Corp.*, 95 *N.J.* 263, 264 (1984). A defect in the design of a manufactured product may constitute a basis for strict products liability in tort. *E.g., Michalko v. Cooke Color & Chem. Corp.*, 91 *N.J.* 386, 394 (1982). In defining a manufacturer's duty and identifying the factors that constitute its breach, we have developed a basic formulation of the strict products liability doctrine as related to defects in design. The requisite elements of a cause of action based on strict liability for design defects comprise proof that (1) the product design was defective; (2) the defect existed when the product was under the control of and distributed by defendant; and (3) the defect caused injury to a reasonably foreseeable user. *O'Brien v. Muskin Corp.*, 94 *N.J.* 169, 179 (1983), (citing *Michalko, supra,* 91 *N.J.* at 394); *see In re Cadillac V8–6–4 Class Action*, 93 *N.J.* 412, 426 (1983).

We have recognized in this context that the term "defect" is not self-defining and has no universally accepted meaning suitable for all strict products liability cases. *O'Brien, supra,* 94 *N.J.* at 180. Ordinarily, the standard for determining whether a manufactured product has been designed defectively involves the risk-utility theory. *Id.,* 94 *N.J.* at 181. Central to the strict products liability doctrine is the thesis that "only safe products should be marketed—a safe product being one whose utility outweighs its inherent risk, provided that risk has been reduced to the greatest extent possible consistent with the product's continued utility." *Freund v. Cellofilm Properties, Inc.,* 87 *N.J.* 229, 238 n. 1 (1981). The risk-utility standard encompasses factors relevant to both the usefulness and the safety of the particular product. *Cepeda v. Cumberland Eng'g. Co., Inc.,* 76 *N.J.* 152, 174 (1978); *see O'Brien, supra,* 94 *N.J.* at 182–84; *Suter, supra,* 81 *N.J.* at 177.

The initial inquiry in this appeal therefore must focus on the evidence bearing on whether the die-casting machine was

146

defective when originally designed, manufactured, and under the control of the manufacturer in terms of the relevant factors encompassed by the risk-utility standard.

> Did the manufacturer act as a reasonably prudent person by designing the item as he did and by placing it on the market in that condition, or should he have designed it to incorporate certain safety features or some other modifications? Depending upon the proofs, some factors which may be considered by the jury in deciding the reasonableness of the manufacturer's conduct include the technological feasibility of manufacturing a product whose design would have prevented or avoided the accident, given the known state of the art; and the likelihood that the product will cause injury and the probable seriousness of the injury. *See Cepeda, supra,* 76 *N.J.* at 174. [*Suter, supra,* 81 *N.J.* at 171–72.]

As noted, plaintiff's expert testified that the machine should have been designed to incorporate a safety interlock so that the machine could shut off all electric power, thereby rendering it inoperative while a worker had his or her hands inside the machine. He expressed the opinion that the machine as originally designed without a safety gate and interlock device was defective because it could malfunction, that is, start up accidently, when a person's hands were in contact with movable parts of the machine. Safety devices of this character would have prevented the inadvertent or unintended start up of the machine and would have protected a worker from placing his or her hands in contact with the moving parts of the machine. He further testified that such safety devices were available and that they could have been incorporated into the machine without detracting from its usefulness or adding unduly to its cost.

This evidence was sufficient under the risk-utility axis to demonstrate that, as designed, the risk of danger inherent in the machine outweighed its usefulness. The evidence disclosed a demonstrable risk of harm to a foreseeble user of the machine in the absence of a safety gate and interlock. Further, the evidence revealed that the technology for incorporating these safety devices was known to the industry at the time the machine was manufactured and that such devices were available and could have been incorporated into the machine without appreciable cost and without impairing its function.

■ In light of this evidence, considered within the framework of the risk-utility standard, we are satisfied that the proofs were adequate to enable the jury to determine that the die-casting machine was defective as originally designed and while under the control of the manufacturer.

### III

■ To establish strict products liability it must be shown that the defect in the product proximately caused the accident and resulting injuries to a foreseeable user while the product was being used for its intended or anticipated purposes. *Michalko, supra,* 91 *N.J.* at 394; *Suter, supra,* 81 *N.J.* at 176. In this case, the trial court ruled that the manufacturer was not liable because the die-casting machine had been substantially altered after it left the manufacturer's control. The Appellate Division, however, reversed and remanded, ruling that factual disputes existed as to the extent of the alteration and its causal relation to the accident. The defendant argues before us that the Appellate Division erred in reversing the trial court. It asserts that a products liability case against a manufacturer involving a product that has been substantially altered should be dismissed as a matter of law, if the "alteration so changes the operation of the machine that an accident, which could not have occurred as the machine was designed, is caused to occur by the very nature of the subsequent changes."

■ Under the strict liability doctrine, a product must reach its user "without substantial change in the condition in which it is sold." *Restatement (Second) of Torts* § 402A(1)(b) (1965). However, a subsequent alteration of a manufactured product will not serve to provide a defense to the manufacturer if that subsequent alteration is not substantial in terms of the essential features of the product. *See Whitehead v. St. Joe Lead Co., Inc.,* 729 *F.*2d 238, 250 (3d Cir.1984) (fact that defendants supplied contaminating lead in the form of ingots as opposed to airborne particles or metal fines deemed inconsequential);

*States Steamship Co. v. Stone Manganese Marine, Ltd.*, 371 *F.Supp.* 500, 505 (D.N.J.1973) (change of shape not dispositive of "substantial change"); *Union Supply Co. v. Pust*, 196 *Colo.* 162, 172, 583 *P.*2d 276, 283 (1978) (*en banc*) (small changes and minor processing do not constitute substantial change).

Further, while a change in a product may be material or significant from a design or operational standpoint, it is not "substantial" for strict liability purposes unless it is related to the safety of the product. "Substantial change" has been characterized as "deal[ing] principally with material changes in the state of the product" linked to the accident as opposed to "[c]hanges to other features [that] had no material effect upon [the machine's] potential for danger." *Ortiz v. Farrell Co.*, 171 *N.J.Super.* 109, 117 (Law Div.1979); *Restatement, supra,* § 402A comment 10. A substantial alteration is one that involves not only a material change in the design or function of the product but also affects the risk of danger in its use. *See Hanlon v. Cyril Bath Co.*, 541 *F.*2d 343, 345 (3d Cir.1975) (substitution of electrical starting device in press brake machine that was mobile and easily activated in place of original foot treadle suspended above the floor and requiring considerable pressure to activate constituted substantial change).

The evidence in this case fairly posed a jury question as to whether the change made by plaintiff's employer to the die-casting machine was "substantial" in terms of increasing its risk of accidental injury. We have noted that as designed, the machine was operated manually; it functioned in two successive but discontinuous cycles. Each cycle could be started only by the use of a specific button and each cycle came to a definite stop before the succeeding cycle could be started. As altered, the machine operated automatically rather than manually, the cycles occurring continuously without interruption. The operational risk of danger in using the machine as originally designed with manual buttons to start each cycle was qualitatively and materially different from the risks of danger in the

automatic operation of the machine in its altered state. Consequently, the evidence in the case was ample to permit a jury to conclude that the die-casting machine, for strict liability purposes, had been substantially altered after it left the control of the defendant.

The critical question then is whether the original defect in the design of the machine—the absence of a safety gate with interlock—constitutes a proximate cause of the accident, notwithstanding the subsequent substantial alteration. We said in *Michalko, supra,* 91 *N.J.* at 400:

> Even a significant subsequent alteration of a manufactured product will not relieve the manufacturer of liability unless the change itself creates the defect that constitutes the proximate cause of the injury. *States Steamship,* 371 *F.Supp.* at 505. Thus, if the defect which, singly or in combination, caused the injury existed before, as well as after, the change, the manufacturer is not relieved of liability, regardless of how much the product has been changed. *Id.; Ortiz v. Farrell Co.,* 171 *N.J.Super.* 109 (Law Div.1979).

This understanding of proximate cause was foreshadowed in *Finnegan v. Havir Mfg. Corp.,* 60 *N.J.* 413 (1972). In that case, plaintiff was injured by a power punch press he was operating for his employer. This Court reversed a judgment *n.o.v.* in favor of the manufacturer. Implicit in our decision was the premise that the original design defect in the die machine—the absence of a safety device—could constitute a proximate cause of the accident, regardless of whether the subsequent alteration—consisting of a change in the starting mechanism of the machine—was deemed substantial by the jury.

The rule that emerges is that the manufacturer of a product may be held strictly liable for injuries proximately caused by a design defect in that product even if the product did undergo substantial change after leaving the manufacturer's control, if the original design defect constituted either the sole or a concurrent or contributing proximate cause of the accident. *See Michalko, supra,* 91 *N.J.* at 400.

In this case, as we have said, the jury could on the evidence presented determine that the machine had been subjected to a substantial alteration after leaving the control of defendant. Still, the jury could reach the further conclusion that the original design, though substantially changed, did contribute to the occurrence of the accident, and that the proximate cause of the accident inhered solely or primarily in the original defective design of the machine. As we observed in *Finnegan:*

> The jury could infer that because of the lack of a safety device the accident would have occurred notwithstanding the change to an electrical foot pedal. Thus, it could conclude that the substitution had little or nothing to do with the happening of the accident. At the most the alteration bears on the issue of proximate cause and was a matter for the jury. [60 *N.J.* at 423–24.]

The jury could also determine that the substantial change contributed to the happening of the accident in conjunction with the machine's original design defect—the absence of a safety gate and interlock. In that event, defendant could still be liable because the original defect, although not the sole cause of the accident, would constitute a contributing or concurrent proximate cause in conjunction with the subsequent alteration. *Michalko, supra,* 91 *N.J.* at 400; *see Freund, supra,* 87 *N.J.* at 247–48; *see also Sheldon v. West Bend Equip. Corp.,* 718 *F.*2d 603, 608 (3d Cir.1983) (under Pennsylvania law, substantial change to products is properly relevant to manufacturer's defense in product liability action only if absent the change, injury would not have occurred); *Southwire Co. v. Beloit Eastern Corp.,* 370 *F.Supp.* 842, 857 n. 21 (E.D.Pa.1974) (for substantial change to negate [*Restatement*] § 402A liability, it must be intervening superseding cause or perhaps even sole proximate cause of injury); *Union Supply Co. v. Pust, supra,* 583 *P.*2d at 283 ("[E]ven substantial changes which do not affect a pre-existing design defect in parts do not absolve the manufacturer of liability.").

Defendant here argues from the evidence that the accidental injury occurred when the completed molded piece struck the trip wire, which was part of the automatic system installed by

the employer, reactivating the machine and causing the mold to close on plaintiff's hand. Consequently, according to defendant, the trip wire alteration could be found by a fact-finder to be the sole proximate cause of the accident, independent of the alleged design defect—the absence of a safety gate and interlock. The trial court's ruling in this case to the effect that the original design defect had in it no "elements which were the proximate cause of this accident," *ante* at 142, apparently accepted this position.

The defendant's argument that in this case third persons responsible for the subsequent alteration of the machine should properly be held liable for plaintiff's accidental injury does not fully take into account the appropriate applications of the principle of foreseeability. When it is foreseeable that a substantial change will create a risk of injury, the manufacturer can be held liable under strict liability principles for injuries proximately caused by such change. In *Cepeda, supra,* we said that "in applying strict liability in torts for design defects, manufacturers cannot escape liability on grounds of misuse or abnormal use if the actual use proximate to the injury was objectively foreseeable." 76 *N.J.* at 177 (citations omitted). Foreseeable misuse or abnormal use can be extended by analogy to foreseeable substantial change of the product from its original design. We recognized this expressly in *Brown v. United States Stove Co., supra,* 98 *N.J.* at 169–170. *See Whitehead v. St. Joe Lead Co., Inc., supra,* 729 *F.*2d at 250. Thus, in the event of either a substantial alteration or misuse, the manufacturer will be responsible for resultant injuries to an operator if the alteration or misuse implicated in the actual use of the machine was foreseeable and could have been prevented or reduced by the manufacturer. *Id.; see also Saupitty v. Yazoo Mfg. Co., Inc.,* 726 *F.*2d 657, 659 (10th Cir.1984) (under Oklahoma law when foreseeable subsequent modification of product causes plaintiff's injury, manufacturer is liable under § 402A); *Merriweather v. E.W. Bliss Co.,* 636 *F.*2d 42, 45, 46 (3d Cir.1980) ("[B]y its very terms, [*Restatement* ]

§ 402A seems to indicate that only unexpected substantial changes will absolve the seller of a product from liability for injuries caused by that product."; * * * [T]he manufacturer * * * should be held responsible for all dangers which result from foreseeable modifications of that product."); *Thompson v. Package Mach. Co.*, 22 *Cal.App.*3d 188, 196, 99 *Cal.Rptr.* 281, 286 (Cal.Ct.App.1972) (manufacturer may be held liable where alteration of machine or its misuse by customer was reasonably foreseeable); *Duke v. Gulf & Western Mfg. Co.*, 660 *S.W.*2d 404, 414 (Mo.Ct.App.1983) (although substantial changes in product may in some circumstances relieve manufacturer of liability, that is not so if changes were foreseeable and did not unforeseeably render product unsafe). Consequently, the mere fact that the machine was substantially altered will not exonerate or absolve the manufacturer from responsibility for a design defect that foreseeably contributed to the ultimate accident.

In sum, the evidence presented in the case fairly raised a jury question as to whether the original design defect in the die-casting machine constituted either the sole, independent cause of the accident or a concurrent or contributing proximate cause. This evidence, together with that relating to the existence of a design defect in the machine while still under the control of defendant, was sufficient to establish a *prima facie* cause of action in strict products liability, warranting the jury's consideration.

### IV

Plaintiff also raised an inadequate safety warning claim in this case. We observed in *Michalko, supra*, 91 *N.J.* at 402–03, that affixing suitable warnings or giving specific cautionary instructions for the benefit of foreseeable users of the inherent dangers in using a machine without a safety device might reduce the risk of injury. *See Bexiga v. Havir Mfg. Co.*, 60 *N.J.* 402, 411 (1972).

██ The Appellate Division ruled that the claim based on failure to warn should be considered on remand.  Plaintiff's claim on this theory was properly dismissed because the only testimony regarding a lack of warnings consisted of the absence thereof at the time of the accident.  While the duty to warn may be found "without regard to prevailing industry standards," *Michalko, supra,* 91 *N.J.* at 402 (citing *Freund, supra,* 87 *N.J.* at 242–43), no evidence about such warnings at the time the machine left defendant's control was offered.  *See Lynch v. Galler Seven-Up Pre-Mix Corp.,* 74 *N.J.* 146, 152 (1977); *Scanlon v. General Motors Corp.,* 65 *N.J.* 582, 591 (1974).  Nevertheless, since the case must be retried, if relevant evidence on this issue is admitted, the question may be appropriately considered by the jury.

<h2 style="text-align:center">V</h2>

By way of conclusion, we add expressly that which is clearly implicit in our analysis and determination, namely, that each of the issues addressed in our opinion, upon a sufficient evidential showing on retrial, is properly to be considered a jury question rather than a matter of law to be decided solely by the court. The distinction we have drawn in this regard in differentiating between matters that present questions of law and questions of fact rests basically upon the distinction we recognize between the determination of a duty and the determination of a breach of duty.

██ As a threshold step, "[i]t is for the Court to determine whether a legal duty will be imposed." *Michalko, supra,* 91 *N.J.* at 398.  In this case, the recognition and imposition of such a duty founded in strict liability principles are clearly settled as a matter of law.  *See Suter, supra,* 81 *N.J.* at 172.  That duty is to manufacture a machine that is suitably safe for its intended or anticipated purposes by foreseeable users under the risk-utility standard.  *Id.*  On the other hand, given the duty, it is the jury that must then determine whether that duty has

been breached. In making this determination the jury in effect resolves the issues so as to achieve the "just result between the parties." *Id.*, 81 *N.J.* at 173.

All of the questions that have been discussed in the course of this decision—original design defect, subsequent substantial alteration, and proximate causation—are properly to be considered jury questions. None as such calls for the creation, recognition and imposition of a basic duty as a matter of public policy. Further, the evidence relating to each is not indisputable or so clearly preponderate in terms of ultimate factual conclusions as to present a matter of law to be determined by the court. As we noted in *Finnegan, supra*, 60 *N.J.* at 423, "it was for the jury to determine whether the substitution * * * was such a 'substantial change' within the meaning of the *Restatement* as would relieve Havir of liability." *See O'Brien, supra*, 94 *N.J.* at 186 (these kinds of questions may be resolved by judge or jury, depending on the adequacy of proofs); *see also Thompson v. Package Mach. Co., supra*, 22 *Cal.App.*3d at 196, 99 *Cal.Rptr.* at 286 (manufacturer may be held liable where alteration of machine or its misuse by customers was reasonably foreseeable, which is jury question, as is whether or not machine was designed with reasonable care to protect persons using product in way it was intended to be used against foreseeable danger); *Merriweather v. E.W. Bliss Co., supra*, 636 *F.*2d at 45 ("[D]etermination is for the fact-finder unless the inferences are so clear that a court can say as a matter of law that a reasonable manufacturer could not have foreseen the change.") (quoting *D'Antona v. Hampton Grinding Wheel Co.*, 225 *Pa.Super.* 120, 125, 310 *A.*2d 307, 310 (1973)).

For the reasons presented, the Court affirms the Appellate Division's judgment that the trial court erred in entering judgment for defendant as a matter of law and that the matter be remanded for trial.

CLIFFORD, SCHREIBER and GARIBALDI, JJ., concurring in the result.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For reversal*—None.